RALPH T. JENSEN and FAYE D. JENSEN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Jensen v. Commissioner
Docket No. 11322-77.
United States Tax Court
T.C. Memo 1980-335; 1980 Tax Ct. Memo LEXIS 244; 40 T.C.M. (CCH) 1058; T.C.M. (RIA) 80335; August 26, 1980, Filed Kerwin H. Fulton,Arnold C. Wegher, and Robert L. Loeb, Jr., for the petitioners. Jeff P. Ehrlich, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes and additions to tax under section 6651(a): [1]/ Addition to Tax
Year
Deficiency
(Sec. 6651(a))
1973
$19,341
$0
1974
$ 4,771
$239
*246 The issues for decision are: 1. Whether amounts received by petitioners from Westlear in 1973 and 1974 constitute ordinary income or capital gain; and 2. if the amounts received by petitioners were capital gain, whether petitioners properly deferred recognition of a portion of that gain until 1974. FINDINGS OF FACT Petitioners Ralph T. Jensen (petitioner) and Faye D. Jensen, husband and wife, were legal residents of Arvada, Colorado, when they filed their petition. They filed joint Federal income tax returns for 1973 and 1974 with the Internal Revenue Service Center, Ogden, Utah. Prior to 1971, petitioner was employed by Modular Technology, Inc. (Modular), as an executive vice-president Petitioner's duties with Modular consisted of managing the day-to-day operations as well as investigating new properties for development. While employed by Modular, petitioner located a 515-acre tract of undeveloped land in Colorado. Modular acquired an option to purchase the land. Subsequently, however, Modular decided not to exercise the option because it had insufficient capital to develop the property. In early 1971, petitioner terminated his employment with Modular. Shortly *247 thereafter, petitioner approached Owen M. Powell (Powell) of Westlear Company (Westlear), a California limited partnership, with a proposal to enter into a joint venture to acquire and develop the 515-acre tract of land. Powell, by letter dated April 20, 1971, advised petitioner that Westlear-- approved, with modifications and conditions, the proposal which Bill Jenkins and I submitted recommending the formation of a joint venture (hereinafter referred to as the "Joint Venture") between you and Westlear Company * * *. The letter discussed the "Purpose of the Joint Venture" and the "Responsibilities of the Joint Venture Partners." The letter further provided that: Funds received by the Joint Venture from the marketing of its property will be distributed to the partners according to the following formula: 1. As a first priority, Westlear is to be paid back all of its invested capital. 2. As a second priority, Westlear is to receive an amount equal to a 35-percent return per annum on the average amount of its invested capital. 3. As a third priority, you are to receive an amount equal to that received by Westlear in item 2 above. 4. The balance is to be divided equally *248 between the partners. The letter further stated: It is understood that Westlear's desire to enter into the Joint Venture is specifically conditioned upon your ability to obtain from Modular Technology, Inc. an assignment of its interest in the Option Contract to the Joint Venture Said assignment must be approved by the Seller and Westlear's legal counsel. Westlear will also require, as a prerequisite to consummating a Joint Venture Agreement with you, an opinion from its legal counsel that it would not be incurring any legal liability to Modular Technology, Inc. by entering into such an agreement. Pursuant to the April 20, 1971, letter, petitioner on June 1, 1971, obtained a release of Modular's option on the property The release, which was part of an overall settlement between petitioner and Modular stated: Modular Technology releases all rights and interests in the Westlake parcel in Denver, Colorado, * * *. Petitioner then acquired an option on the property for Westlear, and on October 7, 1971, Westlear purchased the property. Subsequent to the April 20, 1971, letter, Westlear provided petitioner $2,500 per month to oversee the management of the development of the *249 property. Westlear did not expense the payments but instead capitalized them as acquisition costs of property. In addition, Westlear did not withhold any Federal Insurance Contributions Act or other taxes from the payments. Also, Westlear did not provide petitioner with an automobile, reimburse him for travel expenses which he incurred, or provide petitioner with fringe benefits, such as paid vacations or paid medical insurance, that it customarily provided to its management employees. The parties established a bank account upon which either petitioner or Westlear's representative could write checks. If the amount of the check exceeded $1,000, joint signatures were required. On October 5, 1971, petitioner and Westlear entered into a formal agreement detailing Westlear's obligations and petitioner's duties. The agreement provided that Westlear would employ petitioner as a general manager of the development project, and that petitioner's duties included searching for new property to develop. Moreover, the agreement provided that petitioner would be paid an annual salary of $30,000. The agreement further provided that: Section 3.06. Notwithstanding any other provisions *250 contained in this Agreement, it is mutually understood and agreed (i) that it is not the intent or effect of this Agreement to create a partnership relationship or joint venture relationship between the parties hereto (ii) that Jensen did not, and shall not, have any legal or beneficial interest in the Property, or in any of the proceeds realized from the sale or other disposition of any of the Property, or in the rents, issues or profits of any of the Property * * *. Section 8.01. This Agreement (i) supersedes all prior understandings and contains all representations (ii) cannot be amended except in writing signed by each party hereof * * *. After the execution of the agreement, Westlear continued to treat petitioner in the same manner as it had prior to that time. On November 1, 1972, petitioner and Westlear entered into a settlement agreement terminating the October 5, 1971, agreement. Westlear agreed to continue to pay petitioner $2,500 per month until December 15, 1972, in exchange for petitioner's agreement to assist Westlear's representative in managing the project through that date. In the settlement, Westlear also agreed to transfer $65,000 and two parcels of real *251 estate from the 515-acre tract on January 5, 1973, and $35,000 on January 5, 1974, to petitioner as consideration for the release of his rights under the October 5, 1971, agreement. Westlear further agreed to complete certain improvements on the property transferred to petitioner. Westlear treated these payments as a purchase of petitioner's 50-percent interest in the enterprise and thus capitalized them as a cost of the property. At the date of settlement, Westlear had invested $1,898,000 in the property. The fair market value of the property at that time was approximately equal to this amount. No partnership return was filed in connection with the development of the property. Further, no name was chosen for the enterprise On his income tax return for the years 1973 and 1974, petitioner reported the amounts received pursuant to the settlement with Westlear as capital gain from the sale of an interest in land. Petitioner did not report as income the receipt of a partnership interest in exchange for his services. OPINION Respondent contends that the amounts paid to petitioner under the November 1972 settlement constitute ordinary income. He reasons that petitioner, as *252 a "key employee" of Westlear, received those amounts in settlement of his employment contract. As support for his theory, respondent cites the agreement of October 5, 1971, between petitioner and Westlear which states that no joint venture or partnership was created between the parties. Petitioner, to the contrary, argues that despite the language of the October 1971 agreement, he and Westlear became joint venturers on April 20, 1971. [2]/ A joint venture is considered a partnership for Federal income tax purposes. *253 Sec. 761; Luna v. Commissioner, 42 T.C. 1067, 1077 (1964). In deciding whether petitioner and Westlear became joint venturers, the issue turns on whether "the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise." Commissioner v. Culbertson, 337 U.S. 733, 742 (1949). We think the evidence shows that petitioner and Westlear intended to, and did, join together in carrying on the enterprise of acquiring and developing the property. Although the October 5, 1971, agreement retains the profit-sharing provisions originally agreed upon, it is cast in the language of an employment relationship. The agreement specifically disavows the creation of a joint venture relationship. Nevertheless, we are convinced by the testimony and other documentary evidence that, despite the language of the agreement, a joint venture relationship was created prior to the date of the agreement and continued to exist until it was terminated by the November 1, 1972, settlement. The letter of April 20, 1971, described in our findings, clearly shows an intent to form a joint venture provided that certain *254 conditions, mainly the acquisition of the property, could be met. Westlear's representative dealing with petitioner had presented the proposal to its investment committee as a joint venture arrangement. While that letter could be read as a letter of intent to form a joint venture for the purpose of acquiring, zoning, and selling the property, we think the subsequent actions of the parties proceeded beyond the mere intent to do so. The letter stated that "Westlear's desire to enter into the Joint Venture is specifically conditioned" upon petitioner's "ability to obtain from Modular Technology, Inc. an assignment of its interest in the Option Contract to the Joint Venture." In substance, petitioner met this "specific condition." He negotiated an overall settlement with Modular which included Modular's release of "all their rights and interests in the * * * parcel," including the engineering studies, feasibility reports, and legal work that had been prepared on behalf of Modular. Petitioner then proceeded to negotiate for the purchase of the parcel, and on July 8, 1971, the owners agreed to sell the property to Westlear. The purchase transaction was completed on October 7, 1971. *255 The April 20, 1971, letter contemplated that petitioner would be responsible for the day-to-day management of the business and would devote all of his time to that end. Westlear was to supply "all funds required for the conduct of Joint Venture's business," limited to $111,000 prior to actual purchase of the property. The preliminary budget of $111,000 provided $30,000 for petitioner's "allowance and direct Joint Venture expenses." Consistent with this understanding, petitioner terminated his relationship with Modular, commuted to Colorado for a time, and eventually moved there. He devoted his full time to the promotion and development of the property. On December 27, 1971, he signed an agreement on behalf of Westlear calling for the annexation of the property to the City of Broomfield, Colorado. We think the testimony sufficiently explains the provisions of the October 5, 1971, agreement which purport to create an employment relationship and deny the existence of a partnership. Powell, the vice-president and one of the directors of Southwest Properties, Inc., which was the general partner of Westlear, testified that he worked out the arrangement with petitioner whom he regarded *256 as "a very shrewd land man." Powell proposed that a joint venture be created: that Westlear "would put up the money required to acquire, plan, go through an annexation and zoning process, that he [petitioner] do the work, and that we split the profits" in the manner set forth in the April 20, 1971, letter. When Westlear and petitioner formalized their arrangement, Westlear, on the advice of its lawyers, insisted over petitioner's initial objections that the arrangement with petitioner be documented in the form of an employment contract. Southwest Properties, Inc., through Westlear, was investing large sums of money in the project. Over $100,000 had been invested by October 5, 1971, and within a year its investment in that project exceeded $1,800,000. Petitioner, in contrast, "didn't have a lot of assets." Powell testified: We didn't want to expose our property to potential liens in the future as a result of judgments that might be sought and obtained against him [petitioner] for activities we had nothing to do with. Powell, however, further testified that the execution of the agreement did not change Westlear's relationship with petitioner. Petitioner continued to be *257 regarded as a partner in the project rather than as an employee. Petitioner testified to the same effect. [3]/ We find the testimony of both Powell and petitioner to be credible. *258 After the parties entered into the purported employment contract, Westlear continued to treat petitioner as a partner, and he continued to manage the project. The substance of his relationship with Westlear remained unchanged from that created by the April 20, 1971, letter. Westlear did not withhold taxes from petitioner's allowance nor did Westlear provide petitioner with the fringe benefits customarily provided to its managerial employees. Westlear, in its accounting records, did not expense the payments to petitioner but instead capitalized them as a cost of acquiring and developing the property. Further, the parties continued to hold themselves out to others as partners. Either petitioner or Westlear's representative could write checks upon their joint checking account if the amount of the checks did not exceed $1,000. Checks over that amount had to be jointly signed. Finally, the October 5, 1971, agreement divided the profits under a formula providing for Westlear to be reimbursed for its invested capital, for Westlear to receive a 35-percent return per annum on the average amount of its invested capital, for petitioner to receive an amount equal to the 35-percent *259 return, and for the balance to be divided equally. Although employers may share profits with employees, we believe that the profit-sharing provisions in the October 5, 1971, agreement are more likely to be found in a joint venture arrangement. Significantly, those provisions are the same as the profit-sharing provisions contained in the April 20, 1971, letter. The settlement of November 1972 supports petitioner's contention that a joint venture existed. Petitioner received cash, a portion of the property which was to be jointly developed, and Westlear's commitment to make certain improvements upon that property in exchange for the relinquishment of petitioner's rights under the October 5, 1971, agreement. The settlement further provided that: Each party hereto hereby releases the other from any and all existing claims of whatsoever nature (whether arising under or related to the Basic Agreement, or related to the Tract or the acquisition or development thereof, or to any other matter) * * *. As we read the language of the settlement, the amounts received by petitioner were in liquidation of petitioner's joint venture interest. Respondent contends that even if petitioner *260 received the amounts in exchange for his partnership interest, petitioner nevertheless should recognize ordinary income under section 751, [4]/ because those amounts were received for petitioner's interest in the partnership attributable to substantially appreciated inventory. Section 751(d)(1) provides that: Inventory items of the partnership shall be considered to have appreciated substantially in value if their fair market value exceeds -- (A) 120 percent of the adjusted basis to the partnership of such property, and (B) 10 percent *261 of the fair market value of all partnership property, other than money. The evidence shows that the market value of the property in November 1972 did not exceed 120 percent of the partnership's adjusted basis in the property. Powell testified that at the time that Westlear bought out petitioner's interest in the venture, the market value of the property was approximately the same as Westlear's adjusted basis in the land. [5]/ Thus, the land was not substantially appreciated within the meaning of section 751. Consequently, petitioner recognized capital gain on the sale of his interest in the joint venture. Sec. 741. [6]
*262 Respondent alternatively argues that if the amounts received by petitioner were capital gain, the entire amount should have been recognized in 1973. Respondent reasons that, because 1973 was the year of the sale, petitioner is ineligible for the relief provisions of section 453(b)[7]/ because petitioner received over 30 percent of the sale price in that year. Although it appears to us that the sale occurred in 1972 when the settlement agreement was executed, petitioner has failed to address this issue or contest respondent's determination that all of the gain should have been recognized in 1973. Consequently, because petitioner has failed to show that he made a proper election under section 1.453-8(b), Income Tax Regs., we must sustain respondent's determination on this issue. *263 To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. /↩ All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted.
2. / Although petitioner did not report the receipt of the partnership interest in exchange for his services as income in 1971, the year he received it, that year is not before the Court. There is no evidence as to the value, if any, of the capital interest in the joint venture in 1971, and respondent has not contended that petitioner should recognize the receipt of the interest as income in any other year. See sec. 1.721-1(b)(1), Income Tax Regs.; cf. Hensel Phelps Construction Co. v. Commissioner↩, 74 T.C.     (July 31, 1980).
3. / Petitioner testified in part: This agreement that calls me an employee, was presented to me by the attorneys for Westlear company. * * * [The] attorneys explained to me that this was a--probably one of the larger land deals that Westlear had been involved in. * * * The attorneys for Westlear indicated to me that it was merely a way to protect the corporation and their investors for any acts that I might perform, prior to the time that the project was completed. * * * [The] way it was explained to me is that Westlear knew I was not an employee, the attorneys knew I was not an employee, I was not treated as an employee, but they wanted to put this particular insulation in this particular contract, and I agreed to it. * * * As far as I was concerned, I had been a partner up through that time, and continued to be a partner, and was treated as a partner for the months after this until I left the project. We think the testimony of Powell and petitioner, when viewed in the light of the facts discussed in the text, meets the strong proof rule of Ullman v. Commissioner, 264 F.2d 305, 308 (2d Cir. 1959); Lazisky v. Commissioner, 72 T.C. 495, 501↩ (1979).
4. /SEC. 751. UNREALIZED RECEIVABLES AND INVENTORY ITEMS. (a) Sale or Exchange of Interest in Partnership. -- The amount of any money, or the fair market value of any property, received by a transferor partner in exchange for all or a part of his interest in the partnership attributable to -- (1) unrealized receivables of the partnership, or (2) inventory items of the partnership which have appreciated substantially in value, shall be considered as an amount realized from the sale or exchange of property other than a capital asset.↩
5. Sec. 1.751-1(d), Income Tax Regs., provides that "fair market value" under sec. 751 is to be given the same meaning as "market" in the regulations under sec. 471. Sec. 1.471-4(a), Income Tax Regs., states that: (a) Under ordinary circumstances and for normal goods in an inventory, "market" means the current bid price prevailing at the date of the inventory for the particular merchandise in the volume in which usually purchased by the taxpayer * * *. Powell testified that: We wouldn't have sold for any less than * * * [book value], and I don't think we could have got much more * * *. ↩
6. SEC. 741. RECOGNITION AND CHARACTER OF GAIN OR LOSS ON SALE OR EXCHANGE. In the case of a sale or exchange of an interest in a partnership, gain or loss shall be recognized to the transferor partner. Such gain or loss shall be considered as gain or loss from the sale or exchange of a capital asset, except as otherwise provided in section 751↩ (relating to unrealized receivables and inventory items which have appreciated substantially in value).
7. /Sec. 453(b) provides in part: (1) General rule.--Income from-- (A) a sale or other disposition of real property, or (B) a casual sale or other casual disposition of personal property (other than property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year) for a price exceeding $1,000, may (under regulations prescribed by the Secretary or his delegate) be returned on the basis and in the manner prescribed in subsection (a). (2) Limitation.--Paragraph (1) shall apply-- (A) In the case of a sale or other disposition during a taxable year beginning after December 31, 1953 (whether or not such taxable year ends after the date of enactment of this title), only if in the taxable year of the sale or other disposition-- (i) there are no payments, or (ii) the payments (exclusive of evidences of indebtedness of the purchaser) do not exceed 30 per cent of the selling price.↩